**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

January 8, 2026

**BY ECF**
Honorable Jennifer H. Rearden
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   **United States v. Miguel Bautista**
      **25 Cr. 172 (JHR)**

Dear Judge Rearden:

Miguel Paula Bautista ("Mr. Bautista") is a 53-year-old illiterate laborer and grandfather with no history of violence and a minimal criminal history. Though he has been repeatedly deported and prosecuted for illegal reentry, he has spent most of the last 35 years in the United States leading an otherwise law-abiding life. Following his April 2025 arrest in this case, he was detained at MDC Brooklyn for four months, before satisfying his bail conditions and being released on pretrial supervision. Since his release in July 2025, he has lived in the Bronx with his nephew, Jeifry, and continued to work as a construction laborer and handyman, while demonstrating full compliance with his bail conditions. He comes before this Court for sentencing after admitting his guilt to felony illegal reentry. He faces an advisory Sentencing Guidelines range of 8-14 months. *See* Presentence Report ("PSR") at 24.

Federal Defenders respectfully requests that the Court sentence Mr. Bautista to the time he has already served in custody – nearly four months – and a period of supervision, during which he will almost certainly be placed in immigration custody and deported. This outcome – which will yet again separate Mr. Bautista from his family and broader community in New York, and return him a country he has barely lived in since he was a young adult – is more than sufficient punishment after considering all the factors set forth in 18 U.S.C. § 3553(a). Mr. Bautista is clear that this the last he will be before a court in this country: "I don't want to come back because I'm too old to be going through the same struggles. I don't want to keep breaking the immigration laws of this country, which I respect and admire very much, and hurting my family by going to jail and getting deported." *See* **Exhibit A** (Letter of Miguel Bautista). For these reasons and those set forth below, a sentence of time served, followed by a period of supervision, satisfies the concerns of sentencing as well as the interests of justice.

## I.  FACTUAL BACKGROUND

### a.  Mr. Bautista's Early Life, Initial Immigration to the United States, Nonviolent Drug Convictions, and First Deportation

Miguel Paula Bautista was born on January 3, 1973 on a farm in San Francisco de Macorís, Dominican Republic. The second of four children born to his parents, his mother abandoned him as a young child and his father could not afford to raise him. When he was around seven years old, his father sent him to live and work with his paternal uncle on a dairy farm. There, Mr. Bautista lived in a wooden two-bedroom house with a tin roof, no indoor bathroom, and only intermittent electricity. He awoke daily at 5am to do grueling manual labor, once accidentally cutting off his own thumb while trying to cut a coconut. Mr. Bautista barely attended school and never learned to read; today, he remains functionally illiterate in both Spanish and English. PSR ¶75.

When he was around 16 years-old, Mr. Bautista boarded a "yola"[1] bound for Puerto Rico, in search of better opportunities. He found his way to the gritty, crime-infested streets of late 1980s New York City, where a sole relative – an aunt – lived and only occasionally afforded him shelter. Young, illiterate, and speaking no English, he struggled to find work and experienced homelessness. Against this backdrop, he was an easy target for drug dealers who recruited him to work primarily as a lookout. In 1991, at the age of 18, he was convicted of misdemeanor possession of drug paraphernalia, for which he received no jail time, and in 1992 he was convicted in this District for his role in a drug conspiracy and sentenced to 10 months' imprisonment. *Id* ¶¶36 & 37. During his incarceration, he had no disciplinary issues. *Id*. ¶37. In December 1992, he was deported. *Id*. Once back in the Dominican Republic, he reconnected with his parents, including with his biological mother who had abandoned him at birth. *Id*. ¶53.

### b.  Mr. Bautista's Subsequent Immigration History

Before he was deported, while living in New York City, Mr. Bautista met and started a relationship with Orquidea Nunez. *See* **Exhibit B** (Letter of Orquidea Nunez). He and Orquidea had a son, Michael Paula, who was born in New York and has since grown up and joined the U.S. Air Force. *See* **Exhibit C** (Letter of Michael Paula). After his first deportation in 1992, Mr. Bautista resolved to return to the United States so he could be reunited with Orquidea, Michael, and or Orquidea's daughter, Yohaira, who was like a stepdaughter. *See* **Exhibit D** (Letter of Yohaira

---

[1]  A "yola" is a traditional wooden fishing boat from Puerto Rico or the Dominican Republic.

Solognier). He worked doing demolition until he could save enough money to return, and around 1993, he re-entered the U.S. and resumed working to support his son.

Mr. Bautista spent the next 25 years living and working in New York City. He worked in construction, and as a handyman and porter for residential buildings in West Harlem, forming a strong bond with the tenants. *See* **Exhibits F-K** (Letters of Tenants and Friends). His romantic relationship with Orquidea ended, and he began a relationship with Jicet ("Ingrid") Pena Sosa, with whom he had two more children, his son Graviel and his daughter Ingrid Carmen. In 1997, Ingrid and Mr. Bautista married, and Ingrid petitioned for Mr. Bautista to obtain legal permanent residence. However, the couple appears to have been the victims of immigration fraud, and in 2006 the application was denied.[2] Mr. Bautista was nevertheless able to obtain a work permit and a social security number, which he used to pay taxes for over a decade. PSR ¶86.

In December 2017, Mr. Bautista was convicted in this District for illegal reentry. *Id*. ¶38. He was sentenced to time served, issued a judicial order of removal, and deported for the second time in early 2018. *Id*. ¶38. But this time, he felt like he barely knew the Dominican Republic. He had been out of the country for a quarter century, and felt lost there. He also missed his community and children in the United States. In June 2020, now 47 years old, he once again boarded a crowded "yola" bound for Puerto Rico. Mr. Bautista and the other passengers were intercepted and arrested, and Mr. Bautista was detained and charged in the District of Puerto Rico with illegal reentry. *Id*. ¶39. He spent a year in pretrial detention, during which time he incurred no disciplinary infractions. *Id*. His mother —his last close relative living in the Dominican Republic – passed away during his incarceration. He ultimately pled guilty and was sentenced to time served. *Id*. In June 2021 he was again deported. *Id*. ¶40.

Mr. Bautista returned to the U.S. a final time around 2024, once again to rejoin his community and children. He moved in with his nephew, Jeifry, and resumed working in construction and as a handyman. Between January 2025 and his arrest in April 2025, he worked as a day laborer earning $175 a day. *Id*. ¶77.

---

[2]    Discovery provided under Fed. R. Crim. P. 16 indicates Ingrid was represented by the immigration attorney Thomas Hecht, who was subsequently sued in this District for defrauding clients by, among other things, filing applications for relief for which they were ineligible. *See* Liz Robbins, *Immigrants Claim Lawyers Defrauded Them and They May Be Deported*, NY TIMES (May 3, 2018) https://www.nytimes.com/2018/05/03/nyregion/immigrants-lawyers-defrauded-deportation.html. Hecht settled the lawsuit for an undisclosed amount. *See Guzman, et al. v. Thomas T. Hecht, et al*. 18-Cv-03947 (DLC) ECF No. 175 (Mar. 19, 2020).

## II.    THE APPROPRIATE SENTENCE IS TIME SERVED (NEARLY FOUR MONTHS) FOLLOWED BY A PERIOD OF SUPERVISION

In exercising its discretion to decide an offender's sentence, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). The Court must consider these principles, as well as the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, and the need to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

For Mr. Bautista, these considerations weigh in favor of a sentence of time served (equivalent of nearly four months in custody) followed by a period of supervision.

### A. The nature and circumstances of Mr. Bautista's offense, including the legal and historical context of illegal reentry prosecutions, weigh in favor of lenience.

As an initial mater, the historical context of "illegal reentry" prosecutions militates in favor of restraint in sentencing, because as numerous courts and experts have now found, the origins of § 1326 are flagrantly discriminatory. The Second Circuit has observed that "there is compelling evidence to support that the 1929 Act [the predecessor of 8 U.S.C. § 1326] was promulgated with racial animus as a motivating factor." *United States v. Suquilanda*, 116 F.4th 129, 141 (2d Cir. 2024). As the Circuit found:

> [T]he submitted statements from the legislative history of the 1929 Act, a few of which were reiterated in some form by two of the same members of Congress in 1952, are reprehensible. Repeated references expressed a desire to allow immigration from white populations. Certain members of Congress, and supporters of proposed bills in 1926 and 1928 that laid the groundwork for the 1929 Act, openly expressed animus against Mexicans specifically, and Latin Americans broadly. *See, e.g.*, 69 Cong. Rec. 2817–18 (1928) (statement of Rep. John Box) ("The Mexican peon is a ... blend of low-grade Spaniard, peonized Indian, and negro slave [that] mixes with negroes, mulat[t]oes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat."). This, and other

> statements from members of Congress in the lead up to the 1929 Act, are racist, and most circuits that have considered the motivation behind the 1929 Act have acknowledged its abhorrent origins.

*Id.* (collecting cases).

Despite this "abhorrent" history, the Second Circuit, along with several of its sister circuits, found insufficient evidence that the legislative history surrounding the 1929 Act's reenactment in 1952, which resulted in the modern-day § 1326, demonstrated a "discriminatory purpose" under the standard set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977), and thus declined to invalidate § 1326 under the Equal Protection Clause. *Suquilanda*, 116 F.4th at 139. But the fact that evidence surrounding the 1952 reenactment did not meet the *Arlington Heights* standard does not render the statute's history any less racist. As at least one other court has found:

> [R]acism has permeated the official congressional debate over United States immigration laws since the late 19th and early 20th centuries, including the 1929 Act … Although some members of Congress in 1952 hoped that the INA would eliminate the bigotry of earlier immigration legislation, especially anti-Asian bigotry, other members of Congress at that time continued to express statements exhibiting overt racial, ethnic, or religious prejudices. Indeed, new expressions of prejudice, evidenced by Congress's frequent use in the 1950s of the derogatory epithet "wetback" to describe immigrants from Latin America, emerged during the debate leading to the enactment of the INA.

*United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1061 (D. Or. 2021). This well-documented history of discrimination should weigh heavily in favor of lenience, and against undue punishment.

More broadly, Mr. Bautista is one of the millions of unauthorized immigrants upon whose labor, often physically grueling, this country and city have relied.[3] His offense

---

[3]    The construction industry, to which Mr. Bautista spent the past several decades dedicating his labor, is (along with agriculture) the sector that depends most heavily on immigrant labor, and is suffering severe labor shortages due to immigration enforcement. A recent survey by the Associated General Contractors of America ("AGC") found that 92% of construction firms are struggling to fill positions, and that workforce shortages are the leading cause of project delays in new construction. *See* Scott Neuman, *ICE is sending a chill through the construction industry*, NPR (Nov. 6, 2025) https://www.npr.org/2025/11/06/nx-s1-5575539/ice-immigration-construction-latino-workers; AGC, *New Survey Finds Construction Workforce Shortages Are Leading Cause*

conduct, while problematic, is neither violent nor antisocial; to the contrary, it was motivated by a desire to work, support his family, and be close to his loved ones. Each time Mr. Bautista has re-entered the U.S. he has done just that: working in construction, sharing his meager earnings with his family, and being close to his community. Though he has spent decades working in notoriously exploitative, low-paying jobs, and was himself the victim of fraud when he tried to regularize his immigration status, he nevertheless tried to do the right thing by paying taxes. Given the nonviolent, prosocial nature of this conduct, additional incarceration constitutes pointless and unduly harsh punishment under the principles of § 3553(a).

### B. Mr. Bautista's history and characteristics weigh in favor of time served.

Mr. Bautista's lack of criminal history, and demonstrated law-abidingness, strongly warrants a sentence of time served. His recent criminal history consists exclusively of illegal reentry convictions. PSR ¶¶38 & 39. He has only two non-immigration-related convictions, both of which are nonviolent drug offenses from the early 1990s, and one of which was a misdemeanor resulting in no jail time. *Id.* ¶36. As noted above, far from ignoring immigration laws, he attempted to regularize his immigration status through marriage. Most recently, during the nearly four months he was detained at MDC Brooklyn, he did not have any disciplinary infractions. *Id.* ¶2. And since his release on bail in July 2025, Mr. Bautista has complied fully with the terms of his pretrial supervision. *Id.* ¶3. There is thus zero question that but for his immigration violations, Mr. Bautista has led an overwhelmingly law-abiding life, and in fact has been a valued, contributing member of his community.

Mr. Bautista's family and community in the Bronx make clear he is a good, kind, and hardworking person. His ongoing warm relationship with Orquidea and her daughter, which began in the early 1990s and now spans three and a half decades, demonstrates that he has been a loyal, kind, family man throughout the years he has been living in and reentering the United States. *See* Ex. B & D. His strong relationship with his nephew, Jeifry, with whom he lives and works and who helped coordinate his bail, is further evidence of how closely Mr. Bautista values family. *See* **Exhibit E** (Letter of Jeifry A. De La Cruz). Perhaps most strikingly, the numerous letters of support offered by people for whom Mr. Bautista has worked as a handyman over the years, make clear that even to those who are not family members, Mr. Bautista has been consistently kind, warm, and generous. *See* Ex. F-K.

---

*Of Project Delays As Immigration Enforcement Affects Nearly 1/3 Of Firms*, (Sep. 23, 2025) https://news.agc.org/workforce-development/workforce-shortages-delay-projects/

C. ***The concerns of respect for the law, punishment, deterrence, rehabilitation, and public safety weigh in favor of time served.***

Mr. Bautista already spent four months at MDC Brooklyn. He also faces near-certain immigration custody and deportation as soon as this case is resolved and any period of incarceration is completed. Such consequences inherently promote respect for the law and constitute more than sufficient punishment, particularly given Mr. Bautista's lifelong avoidance of violence, and his demonstrated history of complying with court mandates.

Moreover, additional criminal incarceration would be a profound waste of taxpayer resources. As noted in the Presentence Report, each month BOP incarcerates an individual costs taxpayers more than $4,309. PSR ¶ 100. Despite this expense, federal prisons are chronically overcrowded and understaffed, with widespread cancelation of programming and visitation, and a significant increase in violence and abuse.[4] There is currently a more than $2 billion backlog for maintenance and repairs of crumbling BOP infrastructure that endangers inmates and staff, according to the BOP's own Director.[5] Closer to home, the abominable conditions at MDC Brooklyn – where Mr. Bautista spent four months – have long been a stain on the federal criminal justice system. *See United States v. Chavez*, 22 Cr. 303 (JMF), 2024 WL 50233 (S.D.N.Y. Jan. 4, 2024); *United States v. Colluci*, 12 Cr. 417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024). Under these circumstances, it would be a waste of taxpayer money to return Mr. Bautista, a hardworking, nonviolent father and grandfather, to the overcrowded, understaffed, and patently unsafe conditions of the BOP, only to then deport him.

Mr. Bautista's inevitable forthcoming detention and deportation also provide sufficient general and specific deterrence – to the extent that criminal prosecutions of immigration violations can accomplish either sentencing goal. Three National Academy of Sciences panels have concluded, and empirical data have demonstrated, that "increases in severity of punishments do not yield significant (if any) marginal

---

[4]     *See, e.g.*, Glenn Thursh, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y. TIMES (May 1, 2023), https://www.nytimes.com/2023/05/01/us/politics/prison-guards-teachers-staff.html; Joseph Shapiro, *Shackled For Days and Weeks: A Federal Report Finds Widespread Abuse in Prisons*, THE MARSHALL PROJECT (Jul. 11, 2025) https://www.themarshallproject.org/2025/07/11/report-justice-prison-abuse

[5]     Statement of Colette S. Peters, Director, Bureau of Prisons, Subcommittee on Crime and Federal Gov't Surveillance, U.S. House of Rep. Hearing on "Oversight of the Federal Bureau of Prisons" (Nov. 7, 2023), https://www.bop.gov/resources/news/pdfs/testimony-20231107.pdf.

deterrent effects."[6] And research shows that criminally prosecuting immigration offenses like illegal reentry has minimal if any deterrent effect, given the broader economic and geopolitical trends that actually drive illegal immigration.[7] Section 1326 criminalizes re-entry, but ultimately Mr. Bautista – like many people convicted under § 1326 – re-entered for reasons that cannot (and arguably should not) be reasonably deterred: to work and to be with his family. This motive does not excuse his unauthorized entry, but it weighs heavily against sentencing a nonviolent laborer and family man like Mr. Bautista to further time in criminal custody. *See United States v. Corrujedo-Sanchez*, 453 F. App'x 65, 66 (2d Cir. 2011) (below Guidelines sentence appropriate where motivation for crime was "need to provide for . . . family") (quotations omitted).

Lastly, regarding public safety, there is simply no question that Mr. Bautista poses no danger to the community. But for his immigration violations, Mr. Bautista has avoided criminal activity for decades. His ancient criminal record is devoid of violence and consists of two drug convictions, one of which was a misdemeanor resulting in no jail time. Mr. Baustista has been at liberty since July on minimal bail conditions, without issue. Particularly given his inevitable forthcoming deportation, Mr. Bautista's incarceration is clearly not necessary to protect the public.

### D. A sentence of time served will avoid unwarranted sentencing disparities.

Finally, § 3553(a)(6) instructs the Court to avoid unwarranted sentencing disparities "among defendants with similar records who have been found guilty of similar conduct." Even in cases in which the defendant was convicted of felony illegal reentry and faced an advisory Guidelines range greater than Mr. Bautista's, courts

---

[6]   Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006), https://doi.org/10.1086/503374

[7]   *See* Benjamin Gonzalez O'Brien, *"A Very Great Penalty": Mexican Immigration, Race, and 8 U.S.C § "A Very Great Penalty": Mexican Immigration, Race, and 8 U.S.C § 1326*, 37 MD. J. INT'L L. 39 (2022) https://digitalcommons.law.umaryland.edu/mjil/vol37/iss1/5 ("8 USC §§ 1325 and 1326 have been a part of American immigration policy for over ninety three years with little evidence that rates of undocumented entry are affected by increases in the enforcement of either law"); Michael Corradini et al., *Operation Streamline: No Evidence that Criminal Prosecution Deters Migration*, Vera Institute of Justice (Jun 2018) https://vera-institute.files.svdcdn.com/production/downloads/publications/operation_streamline-report.pdf ("Operation Streamline's lack of any demonstrable deterrent effect arguably makes it 'deterrence theater.' The mass criminal prosecution and incarceration of immigrants provides the illusion of reducing unauthorized immigration, but statistical analysis provides no evidence of any deterrent effect.")

in this District have frequently imposed non-carceral or time served sentences. For example:

- *United States v. Aramis Burgos de la Cruz*, 24 Cr. 379 (NRB): defendant, who had past federal drug conviction and a previous removal, was originally charged with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(2) and pled guilty to a misdemeanor for improper entry (8 U.S.C. § 1325(a)); he was sentenced to time served and one year of supervision where statutory maximum was 6 months' imprisonment;

- *United States v. Guandique-Aguilar*, 22 Cr. 490 (JSR): defendant, who had two previous removals and a prior illegal reentry conviction, was originally charged with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(2) and pled guilty to a misdemeanor for improper entry; he was sentenced to time served where statutory maximum of 6 months was below his advisory Sentencing Guidelines range of 8-12 months;

- *United States v. Contreras*, 22 Cr. 129 (PGG): imposing time served sentence of one day in federal custody following a plea to federal illegal reentry where advisory Sentencing Guidelines range was 15 to 21 months;

- *United States v. Castrillo-Alvarez*, 21 Cr. 767 (PAE): imposing time served sentence of five months' incarceration following conviction for federal illegal reentry where advisory Sentencing Guidelines range was 15 to 21 months;

- *United States v. Mendoza Aguilar*, 21 Cr. 416 (JPO): imposing time served sentence of four months' incarceration following conviction for federal illegal reentry where advisory Sentencing Guidelines range was 10 to 16 months;

- *United States v. Gomez*, 19 Cr. 866 (JPO): imposing time-served sentence of one day in federal custody after 17 months in state custody following conviction for federal illegal reentry where advisory Sentencing Guidelines range was 18 to 24 months;

- *United States v. Casillas*, 19 Cr. 863 (VSB): imposing time served sentence of five months' incarceration following conviction for federal illegal reentry where advisory Sentencing Guidelines range was 15 to 21 months;

- *United States v. Gouldbourne*, 19 Cr. 359 (AT): imposing time served sentence of nine and a half months' incarceration following conviction for federal illegal reentry where advisory Sentencing Guidelines range was 33 to 41 months.

Sentencing Mr. Bautista to time served and supervision would thus align with sentences for similarly situated defendants in this District, and would functionally

expedite Mr. Bautista' deportation. As Mr. Bautista has demonstrated through his perfect compliance with pretrial supervision, he is not a risk of flight and will comply with court orders and immigration authority directives.

***

Miguel Bautista is a 53-year-old illiterate laborer, father, and grandfather who has already spent several months incarcerated due to his most recent re-entry to the United States. He now faces more time in immigration custody, followed by deportation. Under these circumstances, additional prison time, particularly given the wholly nonviolent nature of Mr. Bautista's offense conduct and history, would be greater punishment than necessary under the factors set forth in 18 U.S.C. § 3553(a). Accordingly, the interests of justice favor imposing a sentence of time served, followed by a period of supervision.

Respectfully,

Hannah McCrea
Assistant Federal Defender
(646) 574-0351

CC:    AUSA Dana McCann

**EXHIBITS**

| A. | Letter of Miguel Bautista |
| B. | Letter of Orquidea Nunez, Mr. Bautista's former partner and longtime friend |
| C. | Letter of Michael Paula, Mr. Bautista's son and co-signer of his bond |
| D. | Letter of Yahaira Solognier, Mr. Bautista's stepdaughter |
| E. | Letter of Jeifry A. De La Cruz, Mr. Bautista's nephew, with whom he lives |
| F. | Letter of Katty Almonte, tenant and friend |
| G. | Letter of Chanel Placenco, tenant and friend |
| H. | Letter of Yannely Ramirez, tenant and friend |
| I. | Letter of Rowel Sanchez, tenant and friend |
| J. | Letter of Dolores Pena, tenant and friend |
| K. | Letter of Natacha Olivares, tenant and friend |

# EXHIBIT A

Dear Judge,

My name is Miguel Bautista and I am writing to you in advance of my sentencing.[1] I am from the Dominican Republic and I want to apologize for breaking the laws of the United States. I feel bad for being in this position and I would like to explain why this happened.

I grew up in the Dominican Republic, and I never learned to read or write. To this day, I sometimes get lost because I can't read the signs so I have to call my nephew, Jeifry, to come pick me up. I only finished first grade because I had to start working to support my family. I started working in agriculture with my uncle who was raising me at the time. He used to work at a farm where there were cows, and I helped him raise the calves and then my uncle would do the milk extraction by hand. I grew up struggling financially and so have been working since I was 7 years old to support my family. I started on the cow farm and then transitioned to construction and have been doing that ever since.

I first came to the United States when I was 17 years old. It can be hard to find jobs in the Dominican Republic, and I knew in the United States I could count on people being able to help me find a job. Since I don't have much education, I came here for work and all I've been doing is working to support my family. I was working in construction which is what I like the most. I used to do construction but also used to do apartment cleaning and maintenance, I did that for about 15 years. Now, I have three adult children and four grandchildren. I came back to the United States this time because I wanted to continue working and being with my children and grandchildren. I know I have made mistakes in the past, but I was only trying to support my family.

This whole situation has affected me and my family. I can't sleep thinking about this case. I don't want to come back because I'm too old to be going through the same struggles. I don't want to keep breaking the immigration laws of this country, which I respect and admire very much, and hurting my family by going to jail and getting deported.

Judge, I don't come here to disrespect to the United States. It's actually the opposite, I come here because I love this country. I come here to work hard and to support my family. I feel so sad and I am so sorry that I have broken the law, but I hope you can understand why I put myself in this position and be lenient on me when you sentence me.

Thank you,

Miguel Bautista

---

[1] Dictated to the Federal Defenders of New York in Spanish.

# EXHIBIT B

Honorable Judge Rearden,

My name is Orquidea M. Nunez, and I respectfully submit this letter on behalf of Mr. Miguel Bautista, with whom I share a deeply meaningful personal history.

I met Mr. Bautista through mutual friends in the early 1990s, shortly after his arrival from the Dominican Republic. Within a few months, our relationship grew into a committed partnership, and from that union, our son, Michael, was born. At the time, I was already a mother to a daughter from a prior relationship. Despite the early stage of our relationship, Miguel willingly assumed responsibility not only for me but also for my child, providing stability, protection, and financial support. His readiness to step into this role spoke volumes about his character and values.

Although Miguel is younger than I am, his maturity, sense of duty, and emotional depth were evident from the very beginning. These qualities are particularly remarkable given the hardships he endured in his youth, including being separated from his parents in the Dominican Republic at a young age. Rather than allowing these experiences to harden him, Miguel became a compassionate, patient, and resilient individual.

Over the years, Miguel has been a steady and loving presence in the lives of my children. He led by example, demonstrating integrity, humility, and kindness in his daily actions. He offered guidance during difficult moments, laughter during challenging times, and unwavering support when it was most needed. Even though we are no longer romantic partners, we have remained close, and I have sought to support him through this case because he is, above all, a good person.

Our son, Michael, serves honorably in the United States Air Force, reflecting the values of service and responsibility that Miguel has instilled in his family, as well as our shared respect for the United States. Miguel and I are also proud grandparents of Michael's four children: Christian Michael Paula, Israel Paula, Amelia Paula, and Amarilis Rose Paula.

Miguel's character has consistently reflected accountability and growth. While he acknowledges his unlawful re-entry into the United States, I respectfully ask the Court to consider the context and motivation behind that decision. His return was not driven by disregard for the law, but by an overwhelming desire to reunite with and support his U.S.-citizen children and grandchildren. Family unity was his sole motivation.

Miguel fully understands the seriousness of his situation and has demonstrated a genuine commitment to learning from this experience and moving forward as a better man, father, and grandfather. I sincerely hope the Court will consider these aspects of his character and the profound impact his presence has on his family.

Respectfully submitted,

Orquidea M. Nunez

# EXHIBIT C

Honorable Judge Rearden,

I respectfully write to you with deep concern regarding the criminal case of my father, Miguel Bautista, who is currently facing sentencing. My name is Michael Paula. I am 33 years old, born on January 15, 1992, and I currently reside at 1018 Great Plains Ave., Altus, Oklahoma 73521. I am stationed at Altus Air Force Base, where I proudly serve this country.

My father has been a central figure in my life since childhood. From a very young age, he made the effort to come and pick me up from my mother's home so that we could spend time together. He worked tirelessly to support his family and instilled in me the values that now guide my life as both a father and a service member.

One memory that remains especially meaningful to me is a Christmas when he came to see me after my younger brother had already been born on my mother's side. Not only did my father bring me a gift, but he also brought one for my brother Ángel, showing his generosity and capacity to love beyond obligation. During the time we spent together, he was always protective and attentive. As an adult and a father myself, I now understand his reactions even more clearly.

My father's absence would be devastating to our family. Beyond the emotional support we would lose, my children would be deprived of the presence of a loving grandfather—a role that is invaluable in a child's life.

In addition to his role within our family, my father is a man of good character and strong moral values. While working in a residential building, tenants often expressed their appreciation for how he helped families, even with personal matters that were not part of his responsibilities. He has always strived to be an honest, compassionate individual and a positive influence within his community.

I respectfully ask that you take into consideration our family circumstances. His presence, guidance, and love are essential to our family's stability. Thank you sincerely for your time, attention, and thoughtful consideration of this matter.

Respectfully,

Michael Paula

# EXHIBIT D

Dear Judge Rearden,

My name is Yahaira Solognier. I am writing this letter in support of Mr. Miguel Bautista.

I met Miguel when I was a child. At that time, he was my mother's partner, and from that relationship my brother, Michael, was born. I have many memories from that period of my childhood, and Miguel was a significant presence in our lives.

During a very difficult time for our family, when my grandmother suffered a heart attack, Miguel was the first person to provide my mother with both emotional and financial support, even though they had known each other for only a few months. When we first met him, we were living in my aunt's apartment after migrating to this country and experiencing significant hardship. Miguel later helped my mother secure an apartment so that we could have stability and a safe place to live.

One aspect of Miguel's life that has always stood out to me is his childhood. I learned that he migrated from the Dominican Republic at a young age after being abandoned by his mother due to domestic abuse inflicted by his father. As a result, he was sent to live and work with his uncle. Because his father struggled with alcoholism, Miguel felt responsible for supporting his siblings financially. Despite being a child himself, he took on a parental role for them, as there was no other parental figure to care for them. I cannot imagine how difficult this must have been, yet he stepped up out of responsibility and love for his family.

Our family continues to support Miguel. No matter what happens, we will continue to stand by Miguel and support his well-being. Miguel has endured many traumatic experiences throughout his life, and yet he remains a kind, loving, hardworking person.

I humbly ask the Court to extend compassion and leniency in light of Miguel Bautista's traumatic childhood, past hardships, demonstrated sense of responsibility, positive contributions to his family, and the strong emotional support network available to him.

Thank you for your time and consideration.


Respectfully,

Yahaira Solognier

# EXHIBIT E

12/18/2025

Dear Judge,

Through this letter I inform you that Mr. Miguel Paula Batista is my uncle, and we live under the same roof.[1] My mother, Minerva, is Miguel's older sister.  Miguel and I live together and sometimes we go out to eat, we play dominos, and we work together. I feel that we have grown closer since living together. My dad doesn't live here, he lives in Puerto Rico, so I have come to see Miguel as my father figure. He's been very good as a father figure because he always supports me. He helps me with my decision making and he motivates me and pushes me. We work together doing construction or handyman work like painting, working on bathrooms, and detailing showers. One week ago when I was working, he was helping me out and telling me to keep pushing through the hard work.

My uncle is a very hard-working, punctual and honest person. He's been working in construction and will do overtime. Every day, he wakes up and goes to work. Even with the overtime and long hours, he never gets tired.

When I found out about this case, it wasn't easy because my uncle was going to prison and I ended up taking care of everything with his bail at the time. Since this case happened, Miguel doesn't sleep very well, he has trouble resting and that's not normal. Sometimes I see him get sad and cry and I'm concerned about that. When we talked about this case, he apologized for being in this position and he told me he definitely does not want to come back to the United States because he doesn't want to go through this whole situation ever again.

I would support Miguel emotionally and would help him find a job in the Dominican Republic after this case ends so that he could support himself. His remaining family, like his aunt and his brother, in the Dominican Republic would support him as well. But his children are here. As far as I know, his children were born here in the United States and so I believe his motivation in coming to the United States was to be with them.

Please be lenient on my uncle. I know he has come to the United States multiple times before, but he just wanted to be with his kids and to work as well. He is a very helpful person, very attentive to other people, and he is very reserved. As a family member and friend, he has always been present when I need him. Despite his little knowledge of writing and math, and his little understanding of certain things, I can always count on him. If you need any additional information, you can contact me at 917-374-0664. Thank you.

Sincerely,

Jeifry A. De La Cruz

---

[1] Translated from Spanish by Federal Defenders.

# EXHIBIT F

Katty Almonte

212-729-4845

12/13/2025

To whom it may concern,

I hereby state that I have known Mr. Miguel Paula Bautista for approximately 12 years.[1] During all that time, I have always seen him as a responsible working man with exemplary behavior.

Mr. Paula Bautista has worked in the building where I live, serving as maintenance staff, in charge of cleaning the stairs and keeping common areas in optimal conditions. In the exercise of his duties, he always showed dedication, respect and a humble attitude towards all the people around him.

Based on my experience and that in the years that I have known him, I can affirm that Mr. Miguel Paula Bautista is a person of good morals, serious, honest and worthy of all trust.

If you want additional information, you can contact me though the information provided above.


Kind regards,

Katty Almonte

---

[1] Translated by the Federal Defenders of New York.

# EXHIBIT G

Chanel Placencio

646-262-0966

12/10/2025

To whom it may concern,

Through this letter I want to state that I have known Mr. Miguel Paula Bautista for 10 years.[1]

During the time that I have known Mr. Paula Bautista, who worked for the building where I have lived for 12 years, I can say that Mr. Paula Bautista is a responsible, respectful man, of exemplary behavior.

Based on my experience, and the years I have known him, I can affirm that Mr. Miguel Bautista is an honest and trustworthy gentleman.

If you want additional information, you can contact me through the data provided at the beginning of the letter.

Sincerely,

Chanel Placencio

---

[1] Translated by the Federal Defenders of New York.

# EXHIBIT H

December 18, 2025

Yannely Ramirez

██████████████████

New York, NY 10031

To whom it may concern,

I, Yannely Ramirez write this letter today to inform you that I have known Mr. Miguel Paula Bautista since I was a little girl 6 years old, (today I am a woman of 35 years)., as he was a dear friend to my father Anthonio Ramires and my Family as he was my father coworker, they use to work together in our buildings in 540-550 West 144th Street a friend to our family in our community as well.

My Relationship with Mr. Miguel has been very closed as he always spent time with all of us in our home spending time with my father while he was alive. Miguel and My father help the buildings with Repairs, cleaning and upkeeping as he was the Handymen. I nowhen Miguel to be respectful, loving, Caring, honest and very much love by his family, friends, and neighbors.

Please do not hesitate to contact me or write to me if you need any other information.

Sincerely,

*Yaneli Ramires*

Yannely Ramirez

# EXHIBIT I

December 1, 2025

To Whom it may concern:

Hello My Name, is Rowel A Rodriguez Sanchez I am writing in reference to Miguel Paula Bautista.

Miguel Paula Bautista is a person of good moral character. I realize that might seem hard to believe, given the circumstances, but it's true nonetheless. I have known Miguel Paula Bautista for over 10years, and in that time i have seen him go through ups and downs, but all the while i have been convinced that he is a decent person at the core. He just needs more people to believe in him so that he can become the person i know he can be.

Miguel Paula Bautista has made mistakes, and he is incredibly remorseful, and is willing to do whatever it takes to make reparations, financially and emotionally, if possible. But to do that, he needs you to give him an opportunity to get a second chance. I recognize that Miguel Paula Bautista broke the law, and i do not believe that he should get off without punishment. I just hope you will recognize the power you wield with regard to the future of this man, and make a fair decision.

Thank you.

Raul A. Rodrigez Sanchez

# EXHIBIT J

December 17, 2025

Dolores Pena



212-281-0255

To whom it may concern,

I, Dolores Peña write this letter today to inform you that I am Mr. Miguel Paula Bautista friend for more than twenty-Five years.  Miguel was working in our buildings as a handyman went I met him and live in the community closed to our buildings 540-550 HDFC.

My Relationship with Mr. Miguel has been very closed he has always been with all our Neighbors in our buildings helping us in our Tenants Association and Community Abacates for all the accomplishment we have today in our buildings.  I have Known Miguel to be well behave and with good upbringings always respectful and very much love by our neighbors, friends, and neighbors.  Miguel is not a trouble men in our buildings he one that always have big heart much respect for his neighbors, coworkers and friend in our block, a man with a lot of will to work hard to make a honest living as the hardworking man he is.

Please do not hesitate to contact me or write to me if you need any other information.

Sincerely,

Dolores Peña

# EXHIBIT K

December 16, 2025

TO WHOM IT MAY CONCERN:

I am Natacha Olivares and I am writing on behalf of Miguel Paula Bautista.

I have the pleasure of knowing Miguel Paula Bautista for 7 years and counting. I have enjoyed getting to know Miguel Paula Bautista and being able to acknowledge his as my friend. He is one of the most admirable individuals that I know. The trails of honesty, well ground ness, responsibility, and strength best describe Miguel Paula Bautista. He is the most honest person that i know and has a gift for being tactful with his honesty. He is also a very well grounded person. He holds fast to his morals, yet keeps an open mind to other's opinions. His has always proven to be a responsible person that keeps to his word.

If you have question, PLEASE do not hesitate to contact me. 347.599.7536.